[Civ. No. 24841. Second Dist., Div. Three. July 20, 1961.]

DONALD E. JUDKINS, Respondent, v. AROMALENE, INC. (a Corporation), Appellant.

Moss, Lyon & Dunn, Gerold C. Dunn and Henry F. Walker for Appellant.

Mason, Kinley and Wallace for Respondent.

SHINN, P. J.—The present appeal is by Aromalene, Inc., a corporation, from a judgment entered upon a verdict in favor of Donald E. Judkins for damages for personal injuries sustained by plaintiff in a flash fire which occurred while plaintiff was using a blowtorch in the dismantling, under contract with the defendant, of several metal tanks located on defendant's property.

Plaintiff was proceeding as an independent contractor under agreement for removal of the tanks for compensation. The cause of action is predicated upon alleged negligence of defendant consisting of the maintenance of said tanks and pipes and equipment annexed thereto in an unsafe condition and failure to notify plaintiff of the dangerous condition which was unknown to plaintiff, as a result of which the flash fire occurred while plaintiff was engaged in removing one of the tanks. It was shown by the evidence that the tank contained a chemical composition from which an explosive gas was generated by the heat of plaintiff's blowtorch. The answer pleaded contributory negligence on the part of plaintiff and assumption of risk, which were the proximate causes of plaintiff's injuries.

The grounds of appeal are (1) error in the admission in evidence of noncompliance with a general industry safety order with respect to the nonissuance of a fire permit and giving an instruction thereon; (2) error in instructing the jury with respect to the terms of several other general industry safety orders; and (3) refusal of the court to give defendant's requested instruction on assumption of risk. We have concluded that error was committed in giving instructions on several of the safety orders; that there was no error in giving an instruction on a comprehensive safety order which required a fire permit and admittedly was not complied with; that the court did not err in refusing to give the instruction on assumption of risk; but we have nevertheless reached the conclusion that the errors were not of such a nature as to deprive defendant of a fair trial and to warrant a reversal of the judgment.

The tanks and attached piping had originally been used by a former operator as a "kerosene treater" by which impurities were separated from kerosene. The plant had not been used for 20 years or more; most of it was old, rusted, corroded and useless. There were 7 tanks to be removed. Tanks 1, 2, 3, 4 and 5 were separate from each other and from tanks 6 and 7. The accident occurred when plaintiff was dismantling tank 6, which was located directly beneath tank 7. In the cleaning process sulphuric acid would come down from tank 7 to tank 6, where it would pass through gravel and clay to remove acid and other impurities. From tank 6 the kerosene would then go to other tanks and follow a process, which need not be described.

Plaintiff was an experienced welder, but he was not familiar with this type of rectifying process nor with the condition of

the tanks. He removed tanks 1, 2 and 3 without the use of a torch. They stood on legs and were easily pulled over; the attached pipes fell loose; plaintiff then examined the interior of the tanks, and finding nothing in them, cut them up with the torch into scrap. Tank 4 was some 15 feet high, about 48 inches in diameter at the bottom and about 24 inches at the top. Before working on this tank with the torch plaintiff and defendant's superintendent ran some liquid out of the tank, removed the clay and gravel from it and turned steam in it from defendant's line, which was allowed to run through the tank for some 48 hours. No pipe connected tank 4 with either tank 6 or 7. Plaintiff had been told that sulphuric acid had been used in tanks 6 and 7. He found a pipe attached to tank 6 and tried to turn a valve on it which he could not turn because of its corroded condition. There was a hole in tank 6 at which he sniffed the atmosphere to determine whether there was an odor, but detected none. In the bottom of tank 6 there was 6 or 8 inches of powdered sludge, the residue of kerosene and sulphuric acid. He could see there was no liquid in tank 6. He cut off the end of tank 7 and its supports and smelled no odor of any petroleum product. He did not make a cut in tank 6 with his torch. There were pipes at the top of tank 6 and one that connected tanks 6 and 7. There was a pipe resting on the ground extending from tank 6 to a point where it went into a dike. Immediately after discussing tanks 6 and 7 with Elmer Mangold, who was defendant's superintendent, plaintiff cut a pipe near the top of tank 6. Nothing happened. He then started to make a cut in the same pipe near the bottom of tank 6. There was a flash explosion, certain particles hit his face, his clothing caught fire and his limbs, especially, were severely burned.

Before plaintiff started his work on tanks 6 and 7, he discussed it with Mangold, as he had previously discussed other parts of the work. His principal concern was to find out whether there were lines running from any of the tanks which led to defendant's refinery and whether there was anything in the lines. He was assured by Mangold that there was no such line. He testified that he asked Mangold if there was anything in the tanks that would explode and Mangold told him there was not, and said "There are holes in the tanks" and that Mangold "kicked the bottom with his foot, and there was just a little powder on the ground and in the tanks." He was assured by Mangold the tanks would not explode and "there is no chance of an explosion in the tanks." Plaintiff

knew there was no accumulation of gas in tank 6. He also knew there was a residue of whitish powder in the tank, and could see that some of it had fallen out of the hole. Although Mangold looked at the tank he made no inspection or test, nor did anyone, to determine whether the residue would generate gas under heat. The sole cause of the explosion was the generation of gas from the petroleum residue in the sludge, due to the heat applied to the pipe by the torch.

The jury was instructed in the law of common law negligence. It was also instructed at the request of both parties in the law pertaining to the duties toward invitees. The correctness and applicability of these instructions is not questioned. The safety orders which were read to the jury are summarized in the margin.[1]

It is not questioned by defendant that plaintiff was entitled to the benefit of any of the safety orders which were applicable in the circumstances and under the conditions in which plaintiff's work was being done.

It was clearly proper to instruct on section 6777. Admittedly, no fire permit had been issued to defendant.

Defendant argues, and cites numerous cases which hold, that the mere failure to obtain a license or permit required by law cannot be regarded as a proximate cause of injuries occasioned by the conduct of one who is acting without a license or permit. This argument is beside the point. Here the purpose of the order is to prevent the use of a source of

---

[1]The safety orders are those of the Industrial Safety Board of the Division of Industrial Safety found in title 8 of the California Administrative Code.

Section 6777 requires a written and numbered fire permit signed by the employer or his authorized agent before a flame, arc, spark or heat which is capable of igniting flammable liquids, gases or vapors is used. Before a fire permit is issued the employer shall cause the location where the source of ignition is to be used to be inspected or tested to determine that the source of ignition may be safely used.

Section 6815 relates to opening pipe lines and equipment. It requires (1) the pressure must be reduced to atmospheric or near atmospheric pressure; (2) light oil lines and equipment must be emptied of their contents; (3) other sources of ignition shall be eliminated; (4) the employer or his representative shall be present upon the opening of lines suspected of containing light oil or flammable gas.

Section 4145 relates to operations on open tanks, vats and other containers containing corrosive liquids, when repairs, alterations or cleaning operations are performed on tanks, vats or pans which have last contained corrosive liquids, (1) employees shall be advised of hazards; (2) lines which may contain hazardous liquids shall be disconnected.

Section 4150 relates to open tanks, vats or containers containing flammable liquids. When repairs, alterations or cleaning operations are performed on tanks, vats or in confined spaces which contain or last con-

ignition in locations which might cause fire or even an explosion. If defendant had applied for a permit one would not have been issued until the tanks in question had been inspected and tested, and had been found safe, or rendered safe, for the use of plaintiff's blowtorch in the dismantling of tank 6. Defendant had a duty to make an inspection and a test or tests which would reasonably be required in order to ascertain whether it would be safe for plaintiff to dismantle tank 6 by the use of a blowtorch. Manifestly, such an inspection and test would have to be applied to the sludge that was in the bottom of the tank. It is immaterial of what a proper test would have consisted. Presumably, the mere application of heat to the sludge would have constituted a reasonable effort to ascertain whether fire could be used in safety. Here there was no test at all, and no inspection other than an observation which disclosed that the tank then contained no gas, but did contain a powdery sludge. If defendant had complied with the safety order and had obtained a permit the sludge would have been removed from the tanks before plaintiff started work with his blowtorch. The failure of defendant to make such an inspection and test, and to remedy the condition that existed, was a proximate cause of the explosion which occurred.

 None of the safety orders other than Number 6777 should have been read to the jury. Section 6815 applies to the opening of lines containing light oil or flammable gas. No such line was opened. The line that was cut was not under

---

tained flammable liquid or substance giving rise to flammable vapors (1) all employees engaged in the operation shall be advised of hazards; (2) lines which may convey hazardous materials to the vessels shall be disconnected or shut off; (3) if a source of ignition is to be used the vessels shall be emptied, flushed or otherwise purged of flammable vapors. The test for flammability of vapors shall be made and no source of ignition shall be used if the percentage of combustible vapor is 20% of the lower explosive limit; frequent tests shall be made and the source of ignition shall not be used unless concentration is reduced below 20% of the lower explosive limit; fire extinguishers shall be available.

Section 6760 requires an employer to maintain an accident prevention program.

Section 6761 requires employees to report unsafe or dangerous conditions.

Section 6816 requires the installation of a device other than a valve to prevent the passage of liquid gas or vapor to points where welding or flame cutting operations are performed if necessary to prevent danger to employees.

Section 6821 requires warning signs at tanks containing harmful quantities of poisonous or corrosive substances or giving off harmful vapors of same. This order does not apply to tanks containing only petroleum liquids, gases or vapors.

pressure. It contained no liquid or gas, but only a powdery substance. Section 4145 relates to corrosive liquids. There was no liquid in tank 6. Section 4150 relates to containers which contain or last contained flammable liquid or substance giving rise to flammable vapors. The duty is to disconnect lines which may convey hazardous materials to the vessel and to purge the vessel of flammable vapors. No such line existed and there was no flammable vapor in tank 6 until a vapor was generated by the use of the blowtorch. Section 4150 could not apply to that situation and there was no violation of the section. The failure of the employer to maintain an accident prevention program as required by section 6760, or of employees to report unsafe or dangerous conditions as required by section 6761, or the failure to maintain warning signs as required by section 6821 could not have been a cause of the accident.

Section 6777 has application to all conditions in which a source of ignition is to be used. It encompasses the particular conditions of hazard for which particular requirements for safety measures are prescribed by the other sections which we have discussed. The latter sections were superfluous. They related to nonexisting conditions and could not have formed the basis for a conclusion that any one of the requirements had been violated. The jury could not have been influenced by the fact that light oil lines were not closed off or the tank purged of flammable vapors when there was no light oil line nor flammable vapor to be removed. Section 6777 was the one that applied, and it was controlling as to the duty of defendant to permit the use of a source of ignition only after the location was found to be safe or had been rendered safe. We are firmly of the opinion that the verdict of the jury would have been the same had it been instructed as to none of the safety orders other than section 6777.

The remaining contention of defendant is that the court committed error in declining to give instructions on assumption of risk. There was no error.

This argument proceeds on the assumption that it was error to instruct as to any of the safety orders. We have held that it was proper to instruct as to section 6777. ▮▮ Where the violation of duty consists of nonobservance of a safety order the doctrine of assumption of risk has no application. (*Bickham* v. *Southern Calif. Edison Co.*, 120 Cal.App.2d 815 [263 P.2d 32]; *Finnegan* v. *Royal Realty Co.*, 35 Cal.2d 409 [418 P.2d 17].)

As an alternative ground for holding there was no error in refusing to instruct as to assumption of risk, we hold that there is no merit in the contention of defendant that plaintiff had knowledge of the danger and the extent of it in the work he was doing. In arguing this point defendant confuses assumption of risk with contributory negligence.

"Where the facts are such that the plaintiff must have had knowledge of the hazard, the situation is equivalent to actual knowledge, and there may be an assumption of risk; but where it merely appears that a person could or should have discovered the danger by the exercise of ordinary care, the defense is not assumption of risk but contributory negligence." (*Hayes* v. *Richfield Oil Corp.*, 38 Cal.2d 375, 385 [240 P.2d 580].)

There was no evidence whatever that plaintiff knew that the dismantling of tank 6 by the use of a blowtorch would be a dangerous operation. The residue had remained in the tank for 20 years or more. There was no vapor arising from it. It was known to be the residue of a mixture of kerosene and sulphuric acid, but it was not known nor even suspected by plaintiff, or by Mangold, that the application of heat to the surface of the tank would develop any explosive vapor in the sludge. There was no evidence that either plaintiff or Mangold had encountered a similar condition. Although there was sludge in the other tanks which were cut up with the torch, three of them had broken up when they were pulled over and the fourth one which contained vapor had been cleaned out before commencement of the cutting up process. Not only was there a lack of evidence to prove that plaintiff had knowledge of any danger in the work, but in view of his experience with the other tanks and the assurances given him by Mangold, there was no evidence that would have warranted even a finding that he was guilty of contributory negligence.

The judgment is affirmed.

Vallée, J., and Ford, J., concurred.

A petition for a rehearing was denied August 15, 1961, and appellant's petition for a hearing by the Supreme Court was denied September 13, 1961. Traynor, J., and Schauer, J., were of the opinion that the petition should be granted.